IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

|  |  |
|---|---|
| ANTHONY Y., | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:22cv11 |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Anthony Y. ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for supplemental security income ("SSI") under the Social Security Act. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. § 636(b)(1)(B)–(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. ECF No. 11.

Presently before the Court are the parties' cross motions for summary judgment, ECF Nos. 16, 18. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Eastern District of Virginia Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 16, be **DENIED**, the Commissioner's Motion for Summary

Judgment, ECF No. 18, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for SSI on June 4, 2020, and an application for DIB on June 8, 2020, alleging disability due to diabetes mellitus, diabetic neuropathy, diabetic feet, bilateral lower extremity edema, and chronic kidney disease. R. at 66–67, 237.[1] Plaintiff's applications were initially denied on August 21, 2020, and again denied upon reconsideration on October 29, 2020. R. at 66–67, 111–18, 123–29. On December 22, 2020, Plaintiff requested a hearing before an administrative law judge. R. at 131–36.

A hearing was held on August 26, 2021, at which Plaintiff appeared via telephone with counsel before Administrative Law Judge Linda S. Harris Crovella ("the ALJ"). R. at 33–65. Both Plaintiff and an impartial vocational expert testified at the hearing. R. at 37–65. On September 22, 2021, the ALJ issued a decision finding Plaintiff not disabled.[2] R. at 16–27. Plaintiff filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied on December 9, 2021, making the ALJ's decision the final decision of the Commissioner. R. at 1–3.

Having exhausted his administrative remedies, on February 1, 2022, Plaintiff filed a Complaint for judicial review of the Commissioner's decision. ECF No. 1. On June 1, 2022, Plaintiff filed a motion for summary judgment and accompanying brief in support. ECF Nos. 16–17. On July 8, 2022, the Commissioner filed a motion for summary judgment and brief in support.

---

[1] "R." refers to the certified administrative record that was filed under seal on March 30, 2022. ECF No. 10, pursuant to Eastern District of Virginia Local Civil Rules 5(B) and 7(C)(1).

[2] Upon Plaintiff's voluntary amendment of his alleged disability onset date, the ALJ dismissed Plaintiff's request for a hearing based upon a claim for DIB, and proceeded only with Plaintiff's SSI application. R. at 17.

ECF Nos. 18–19.  Plaintiff filed a reply on July 22, 2022.  ECF No. 20.  Because the motions are fully briefed, the matter is now ripe for recommended disposition.

## II.  RELEVANT FACTUAL BACKGROUND

The Record included the following factual background for the ALJ to review:

Plaintiff was fifty-one years old at the time of his amended alleged disability onset date.[3] R. at 313.  Plaintiff reported he suffers from: diabetic neuropathy, bilateral lower extremity edema, and chronic kidney disease.  R. at 237.

The highest grade of school Plaintiff completed was ninth grade.  R. at 238.  Plaintiff has not completed specialized job training, trade, or vocational school.  R. at 238.  On a Disability Report, completed June 2, 2020, Plaintiff checked the boxes confirming he can speak and understand English, he can read and understand English, and he can write more than his name in English.  R. at 257.  Plaintiff also completed a Function Report on June 29, 2020, with the assistance of his wife.  R. at 277.

Plaintiff lives in a ground floor apartment with his wife.  R. at 45.  Plaintiff's wife does not work, she receives disability benefits, and she does all the cooking and cleaning in their household. R. at 45.  Plaintiff takes the garbage out and sometimes washes dishes.  R. at 46.  Plaintiff is a "night person" and usually goes to sleep at three or four in the morning and gets out of bed around one in the afternoon.  R. at 46.

Plaintiff previously worked as a dishwasher from the 1990's through 2013 on and off, for seven hours per day three days per week.  R. at 238.  Plaintiff also previously worked as a kitchen helper from 2006 to 2011, for six hours per day four days per week.  R. at 238.

---

[3] Prior to the ALJ hearing, Plaintiff amended his alleged disability onset date from January 1, 2013, to June 4, 2020.  R. at 313.

## A. Plaintiff's Medical Records Relevant to His Alleged Impairments

Plaintiff sought podiatry treatment for diabetic foot care, to have his toenails examined, and pain in his big left toe. R. at 659, 662, 871. In April 2020 and October 2020, Plaintiff's podiatry exam revealed right foot calluses, "thick, brittle, discolored yellow to brown, crumbly and dystrophic" nails, "dry, cracked skin" on both feet, "white scaly patches" on his feet, "Moccasin distribution with erythematous skin" on the perimeter of both of his feet, and issues with his left big toenail. R. at 660, 663, 872. Plaintiff was diagnosed with tinea pedis of both feet, tinea unguium, diabetes mellitus type 2, dry skin, fibroma of the left foot, and calluses. R. at 660, 663, 872. Plaintiff's podiatrist debrided his nails, shaved his calluses, and prescribed medication. R. at 660, 663, 872.

In June 2020, Plaintiff's primary care physician, Dr. Aspill noted Plaintiff had no edema or calluses on his right foot, and no ulcers.[4] R. at 713. He noted Plaintiff did have dry scaly skin between his toes, a small cystic mass on his left foot arch, and 2+ pitting edema bilaterally. R. at 713. Upon examination in September 2020, Dr. Aspill noted again Plaintiff did not have any edema or calluses on his right foot, he had dry, scaly skin between his toes, and he had trace pedal edema.[5] R. at 844. Dr. Aspill reported that Plaintiff walked with a normal gait and exhibited full strength in all his extremities. R. at 713, 844.

Plaintiff sought treatment for knee pain after experiencing progressively worse knee pain over the last several years. R. at 708–10, 775–77, 800–02. Upon examination in June 2020, Plaintiff walked without an assistive device, Plaintiff's knees were stable to varus and valgus stress, Plaintiff performed bilateral straight leg raising, and Plaintiff had full strength in both legs

---

[4] Plaintiff argues Dr. Aspill noted edema and calluses on his right foot, ECF No. 17 at 13, however it appears Dr. Aspill's note reads that Plaintiff did **not** have those impairments on his right foot. R. at 713.
[5] Again, Plaintiff argues Dr. Aspill noted calluses on his right foot, ECF No. 17 at 13, however it appears Dr. Aspill's note reads that Plaintiff did **not** have that impairment on his right foot. R. at 844.

and full bilateral range of motion in his hips and ankles. R. at 708–09. An x-ray of Plaintiff's knee showed "moderate joint space narrowing, medical compartment, left greater than right." R. at 709. In June 2020, Plaintiff's primary osteoarthritis was treated with a cortisone injection. R. at 709. Plaintiff participated in physical therapy for several months. R. at 785–802. At his physical therapy appointments throughout 2020, Plaintiff reported low levels of pain. R. at 797 (rating his pain as a "2" on the pain scale), 793 (rating his pain as a "1"),791 (rating his pain as a "0"), 789 (rating his pain as a "2"), 787 (rating his pain as a "4"). In July 2020, Plaintiff reported his knee was "so so" and that "it has gotten a[ ]lot better since starting therapy. R. at 785. It was noted that he demonstrated functional active range of motion, strength, and overall function. R. at 785. Plaintiff was pleased with his status, met his therapy goals, and requested to be discharged. R. at 785–86.

Plaintiff has received a variety of other medical treatments, unrelated to his alleged impairments that he raised on appeal to this Court. Dr. Yan Guo performed a diabetic eye exam for Plaintiff. R. at 826–831. Dr. Guo diagnosed Plaintiff with DM type 2 without retinopathy, posterior subcapsular polar age-related cataracts in both eyes, vitreous floaters in his left eye, and amblyopia of both eyes. R. at 826–27. Plaintiff received treatment for sleep apnea, asthma, and allergies. R. at 240–42, 284. Plaintiff received treatment for gastrointestinal issues. R. at 242, 285, 300–03, 645–58. Plaintiff has documented back issues. R. at 243–44, 300–03. Plaintiff has documented dental pain. R. at 343–45. Finally, Plaintiff has received medical treatment and testing for heart conditions. R. at 243, 352–54, 356–57, 361, 382–93, 428, 471–641.

### B. Relevant Medical Opinions

Dr. Robin Corbett and Dr. Concepcion S. Aspill completed Medical Source Statements for Plaintiff. On May 25, 2020, Dr. Corbett opined Plaintiff's conditions include GERD, dysphagia,

5

helicobacter pylori, a history of gastrointestinal ("GI") bleed, constipation, and gastric ulcers. R. at 700. Dr. Corbett opined Plaintiff could lift or carry less than ten pounds frequently, ten pounds occasionally, twenty pounds occasionally, and fifty pounds rarely; stand or walk for less than two hours; sit for at least six hours; and Plaintiff would miss zero to one days a month because of his impairments. R. at 700. On June 9, 2020, Dr. Aspill opined Plaintiff suffers from lower back pain, knee pain, muscles spasms, shortness of breath, and depression or anxiety. R. at 711. Dr. Aspill opined Plaintiff can lift or carry: less than ten pounds occasionally, ten pounds rarely, twenty or fifty pounds never; can stand or walk for less than two hours; and it is unnecessary for Plaintiff to use a cane or other assistive device or to elevate his legs. R. at 711. Dr. Aspill did not have an opinion on how often Plaintiff would be absent from work because of his impairments. R. at 711. Scarlett Jett ("Jett"), Psy.D., completed a psychological and intelligence evaluation of Plaintiff. R. at 812–822. Plaintiff was referred for the evaluation because he applied for mental disability benefits. R. at 812. Plaintiff reported he was depressed and unable to read, has difficulty learning new material, and was in special education because he "'can't read.'" R. at 812–14. Plaintiff reported he "is able to write." R. at 814. Jett opined Plaintiff has borderline intellectual functioning and Plaintiff exhibits mild to moderate limitations understanding, remembering, or applying simple directions and instructions and moderate to marked limitations understanding, remembering, or applying complex directions and instructions. R. at 818–19. Jett opined Plaintiff has unspecific depressive disorder with psychotic features and cocaine use disorder in sustained remission and recommended individual psychological therapy. R. at 820.

At the initial level of review, Dr. Bert Spetzler and Dr. Andrew Bockner, state agency medical consultants, reviewed Plaintiff's medical records. R. at 66–85. They found that Plaintiff has difficulty standing because of his feet, knees, and back, has difficulty putting on shoes and

socks, and has difficulty getting in and out of a bathtub. R. at 69, 81. Plaintiff is unable to lift more than ten pounds, unable to walk further than one half of a block, and has vision problems. R. at 69, 81. Plaintiff can lift and or carry twenty pounds occasionally and ten pounds frequently; stand and or walk for about six hours in an eight hour workday; sit for about six hours in an eight hour workday; perform unlimited balancing; frequently climb ramps and stairs; occasionally stoop, kneel, crouch, or crawl; never climb ladders, ropes, or scaffolds; and Plaintiff must avoid concentrated exposure to extreme heat and cold, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. R. at 76. Plaintiff is unable to read or write, but has no problems remembering, concentrating, following instructions, or getting along with others. R. at 69, 81. Additionally, Plaintiff can pay his bills, count change, and manage a bank account. R. at 69, 81–82. The evidence suggests Plaintiff should be capable of lifting or carrying up to twenty pounds and should be able to stand or walk normally throughout the course of a typical eight hour workday during a forty hour work week with normal work breaks. R. at 71, 77. Also, although Plaintiff reports problems with his vision, Plaintiff does not use corrective lenses and his exams show no vision problems. R. at 71. Furthermore, they found that the evidence suggests Plaintiff is capable of performing at least simple and routine tasks despite his psychiatric history. R. at 72, 76. Plaintiff has trouble reading, but can use public transportation, go out alone, shop in stores, and handle money. R. at 77. It was noted that Plaintiff completed the ninth grade. R. at 78. Plaintiff has mild limitations in understanding, remembering, or applying information; mild limitations in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and no limitations in adapting or managing himself. R. at 73.

Upon reconsideration, Dr. William Rutherford, Jr. and Dr. Leslie Montgomery, state agency medical consultants, reviewed Plaintiff's medical records. R. at 86–105. There was

insufficient evidence to fully evaluate Plaintiff's condition prior to September 30, 2017— Plaintiff's date of last insured. R. at 90–91. Additionally, they found Plaintiff's statements regarding his symptoms to be partially consistent with the medical evidence in the file. R. at 92, 100. Based on the evidence, Plaintiff should be able to perform light work despite his physical impairments and at least simple and routine tasks despite his psychiatric history. R. at 98. Plaintiff has no trouble remembering, concentrating, following instructions and Plaintiff can pay his bills, count change, and manage a bank account. R. at 100. Plaintiff is capable of working within a schedule and at a consistent pace, would not require special supervision, and would be able to maintain his work for at least two hours at a time with breaks. R. at 103. Additionally, they confirmed the findings of Dr. Spetzler and Dr. Bockner. R. at 92, 100.

### C. Plaintiff's Testimony at ALJ Hearing

Plaintiff testified about his living situation, previous employment, physical impairments, and why he alleges he is unable to work. R. at 36–58. At the time of the ALJ hearing, Plaintiff and his wife had been married for nineteen years, with a separation for two years around 2016 or 2017, reconciling in 2018. R. at 57. Plaintiff lives in a ground floor apartment with his wife and has resided there for three years. R. at 44–45. Prior to Plaintiff's wife moving into her apartment, Plaintiff was homeless. R. at 57–58. Plaintiff lives with his wife fourteen days a month and on the other days Plaintiff stays at a shelter or on a bench in a Newport News park. R. at 48–49. When Plaintiff is unable to stay at the apartment, Plaintiff's wife drives him to the park or the shelter. R. at 56–57. Plaintiff's wife does not work and receives disability benefits. R. at 45. Plaintiff's wife does all the cooking and cleaning for their household, while Plaintiff takes the garbage out and sometimes washes dishes. R. at 45–46. Plaintiff testified he was a "night person"

8

and generally goes to bed around three or four in the morning and gets out of bed around one in the afternoon. R. at 46.

Plaintiff previously worked at Golden Corral in Newport News as a dishwasher, cleaner, and helped open the restaurant in the morning. R. at 46–48, 53–54. Plaintiff's testimony at the hearing explained he left his job at Golden Corral because of pain in his feet and knees. R. at 46. Plaintiff testified he did not quit his job at Golden Corral, but was fired because his feet became swollen and he could not go into work or walk on his feet. R. at 46–47. Additionally, Plaintiff worked as a dishwasher at Port Warwick Hospitality, which was a restaurant called Schlesinger's. R. at 54. Plaintiff is not currently working and has no income. R. at 48.

Regarding his ability to get around, Plaintiff testified he can stand for about twenty minutes and can walk for about fifteen minutes. R. at 56. Plaintiff has never had a driver's license. R. at 56. Plaintiff does not drive and previously used the bus to get to his medical appointments with his brother's assistance, but now his wife gives him rides. R. at 49, 57. Plaintiff's brother also helped him navigate the bus system. R. at 50–51.

Plaintiff testified about his feet conditions. R. at 47. Plaintiff takes prescribed medications for his diabetes and for his feet and soaks his feet. R. at 47, 56. Plaintiff experiences intermittent tingling in his feet and Plaintiff testified he is unable to walk on or put pressure on his feet. R. at 54. There are circular shaped spots on the bottom of Plaintiff's feet that are hard and sore. R. at 55. Plaintiff's doctor debrides, or shaves down, the spots on his feet, but the spots come back after two or three weeks. R. at 55. Plaintiff will soak his feet and try to shave the spots down himself. R. at 55. Plaintiff also experiences problems with his knees and he testified they "giv[e] out on [him]." R. at 55.

Regarding his education and literacy, Plaintiff testified he was in special education classes in school, but he was unable to read the books in his reading classes in school. R. at 51. Plaintiff's wife helped him fill out the applications for his previous jobs. R. at 51. Additionally, Plaintiff had to take a test on a computer for a previous job, but the manager typed the answers in for him. R. at 51–52. Plaintiff only uses his cellphone to make calls and play Candy Crush, which is a matching game. R. at 52.

### D. Vocational Expert Testimony at the ALJ Hearing

Lori A. Cowan (the "VE") testified at the ALJ hearing. R. at 58–65. The VE classified Plaintiff's past work as a dishwasher as medium exertion, unskilled labor, which would exceed the current light exertional level Plaintiff was limited to. R. at 59. Plaintiff can work as a production assembler, unskilled light exertional level, and there were 59,500 openings available in that position at the time of the ALJ hearing. R. at 59–60. Plaintiff can work as a cafeteria attendant, unskilled light exertional level, and there were 28,100 openings available in that position at the time of the ALJ hearing. R. at 60. Finally, Plaintiff can work as a housekeeper, unskilled light exertional level, and there were 220,300 openings available in that position at the time of the ALJ hearing. R. at 60. The ALJ posed a hypothetical question:

> If we assume an individual the same age, education, and work experience as the [Plaintiff] who can perform light work except he can frequently climb ramps and stairs but he can never climb ladders, ropes, or scaffolds. He can occasionally stoop, kneel, crouch, and crawl. He cannot tolerate concentrated exposure to temperature extremes, humidity, pulmonary irritants, or hazards. He can perform simple, routine, and repetitive work in a stable work environment. He can maintain concentration, persistence, and pace in two-hour periods with customary breaks to complete an eight-hour workday. He can ask simple questions and accept instruction from supervisors. And he cannot perform a job that requires written reports or following written instructions.

R. at 59. The ALJ asked if this hypothetical individual would be able to work as a production assembler, cafeteria attendant, or housekeeper if they could only stand or walk for four hours in

10

an eight hour work day. R. at 60. The VE answered this individual would be at a sedentary level. R. at 60. The ALJ then asked if the individual needed to take a short break after every hour throughout the work day would he be able to work as a production assembler, cafeteria attendant, or housekeeper and the VE answered yes as a cafeteria attendant or housekeeper, but not as a production assembler. R. at 60–61. The VE testified the position of production assembler could be replaced with a press operator. R. at 61. The ALJ ended by asking the VE if the individual was off task for ten percent of the workday and absent on a nonconsecutive basis up to eleven days annually if that individual would be able to perform those jobs and the VE answered the individual would not be able to maintain employment. R. at 61–62.

Then, the Plaintiff's attorney questioned the VE. R. at 62–64. Plaintiff's attorney asked if the hypothetical individual could stand and walk for five or five and a half hours during the workday (as opposed to four) whether that would change the types of jobs that individual could perform and the VE answered the exertional level would still be sedentary. R. at 62. The Plaintiff's attorney asked how a person is classified as able to work light or sedentary jobs and the VE answered light work requires a person to stand and walk for at least six out of eight hours in a workday. R. at 62–63. The VE clarified that an individual who cannot read or take written instruction would not be "a candidate for light level employment that would allow a greater amount of alternate sitting and standing." R. at 63. The Plaintiff's attorney asked if an individual unable to work at a production-rate pace can still do light level jobs previously mentioned and the VE answered yes with the exception of the production assembler. R. at 63.

## III. THE ALJ'S DECISION

To determine if the claimant is eligible for benefits, the ALJ conducts a five-step sequential evaluation process. 20 C.F.R. § 416.920; *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015)

11

(summarizing the five-step sequential evaluation). At step one, the ALJ considers whether the claimant has worked since the alleged onset date, and if so, whether that work constitutes substantial gainful activity. § 416.920(a)(4)(i). At step two, the ALJ considers whether the claimant has a severe physical or mental impairment that meets the duration requirement. § 416.920(a)(4)(ii). At step three, the ALJ determines whether the claimant has an impairment that meets or equals the severity of a listed impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. § 416.920(a)(4)(iii). If the claimant does not have an impairment that meets or equals the severity of a listed impairment, the ALJ will determine the claimant's residual functional capacity, that is, the most the claimant can do despite her impairments. § 416.945(a). At step four, the ALJ considers whether the claimant can still perform past relevant work given his or her residual functional capacity. § 416.920(a)(4)(iv). Finally, at step five, the ALJ considers whether the claimant can perform other work. § 416.920(a)(4)(v).

The ALJ will determine the claimant is not disabled if: they have engaged in substantial gainful activity at step one; they do not have any severe impairments at step two; or if the claimant can perform past relevant work at step four. *See Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014). The ALJ will determine the claimant is disabled if the claimant's impairment meets the severity of a listed impairment at step three, or if the claimant cannot perform other work at step five. *Id.*; *see also Mascio*, 780 F.3d at 634–35 (noting the ALJ will only determine the claimant's residual functional capacity if the first three steps do not determine disability).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law:

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity

12

since the amended alleged disability onset date of June 4, 2020. R. at 19. At step two, the ALJ found that Plaintiff has the following severe impairments: arthritis of the bilateral knees, diabetes mellitus, obesity, borderline intellectual functioning, and depressive disorder. R. at 19. At step three, the ALJ considered Plaintiff's severe impairments and found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpart P, Appendix 1. R. at 19–22.

After step three, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform light work, with the following limitations: Plaintiff can frequently climb ramps or stairs; occasionally stoop, kneel, crouch, or crawl; never climb ladders, ropes, or scaffolds; cannot tolerate concentrated exposure to temperature extremes, humidity, pulmonary irritants, or hazards; can perform simple, routine, and repetitive work in a stable environment; can maintain concentration, persistence, and pace for two hour periods with customary breaks to complete an eight hour workday; and can ask simple questions and accept instruction from supervisors, but cannot perform a job that requires written reports or reading written instructions. R. at 22. In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and § 416.929 and SSR 16-3p." R. at 22.

At step four, the ALJ determined Plaintiff was incapable of performing his past relevant work as a kitchen helper, which is considered medium exertional level work. R. at 25. While Plaintiff cannot resume his prior employment, the ALJ determined at step five that Plaintiff can perform other jobs that exist in significant numbers in the national economy. R. at 26–27. Thus,

the ALJ determined that Plaintiff was not disabled from the alleged onset date, January 13, 2013, through the date of her decision, September 22, 2021.[6] R. at 27.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It consists of 'more than a mere scintilla of evidence but may be somewhat less than a preponderance.'" *Britt v. Saul*, 860 Fed. Appx. 256, 260 (4th Cir. 2021) (quoting *Craig*, 76 F.3d at 589). The Court looks for an "accurate and logical bridge" between the evidence and the ALJ's conclusions. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio*, 780 F.3d at 637.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589. If "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ).'" *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial

---

[6] In her decision, the ALJ wrote the Plaintiff had "not been under a disability . . . from January 1, 2013, through the date of this decision . . . " which was his original alleged disability onset date. R. at 27. However, Plaintiff amended his alleged disability onset date to June 4, 2020. R. at 16.

of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

Plaintiff's appeal to this Court raises several challenges to the ALJ's decision. Plaintiff alleges (1) the ALJ's decision that Plaintiff is not illiterate is not supported by substantial evidence; and (2) the ALJ failed to consider Plaintiff's diabetic feet and foot disorders as medically determinable impairments.

### A. Substantial Evidence Supports the ALJ's Decision that Plaintiff is Not Illiterate.

Plaintiff argues the ALJ erred by not finding Plaintiff to be illiterate, and if the ALJ had done so, then Plaintiff would have been disabled pursuant to the Medical-Vocational Guidelines set out in 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Grid Rules"). In response, the Commissioner argues the ALJ's consideration of Plaintiff's alleged illiteracy is supported by substantial evidence. ECF No. 19 at 12–14. Specifically, the Commissioner argues the Plaintiff's Disability Report states Plaintiff can read English, understand English, and write more than his name in English. ECF No. 19 at 13. Next, the Commissioner argues "there is no indication that a person other than Plaintiff reviewed and signed the [Plaintiff's] Appointment of a Representative or the Contingent Fee Agreement contained in the record" and there is no evidence the agreements are unenforceable because Plaintiff was unable to read them. ECF No. 19 at 13. Next, the Commissioner argues Plaintiff reported to Jett that he cannot read, but he is able to write. R. at 814; ECF No. 19 at 13. Also, the Commissioner argues the record does not show Plaintiff required any special accommodations because of an inability to read or write when he underwent testing with Jett. ECF No. 19 at 13. Finally, the Commissioner argues "no treating or examining provider

suggested Plaintiff is illiterate or incapable of reading or signing anything on his own behalf." ECF No. 19 at 13.

Notably, the Commissioner highlights the fact that the ALJ did consider Plaintiff's claim of illiteracy. ECF No. 19 at 13. For example, the ALJ discussed illiteracy and the ALJ noted Plaintiff's highest level of education achieved. ECF No. 19 at 13. Importantly, the Commissioner argues "[d]espite not finding Plaintiff illiterate, the ALJ crafted an RFC assessment that limited Plaintiff to work that did not require the ability to write reports or read written instructions." ECF No. 19 at 13.

In his Reply, the Plaintiff reiterates his argument that just because Plaintiff can read or write more than his name in English does not mean he is not illiterate. ECF No. 20 at 2. The Plaintiff also argues Plaintiff's contract for legal representation was read to him. ECF No. 20 at 2. The Plaintiff further argues illiteracy is defined as an inability to read or write, so Plaintiff's inability to read should classify him as illiterate. ECF No. 20 at 3. Additionally, Plaintiff argues he has between a third and fourth grade reading level, which according to the Social Security Administration's Program Operations Manual System, ("POMS"), should classify him as illiterate. ECF No. 20 at 3. Finally, the Plaintiff argues while no doctors found him illiterate, no doctors specifically stated "whether he is [illiterate] one way or the other" and the ALJ did not acknowledge Jett's "finding that [Plaintiff] cannot understand words . . . ." ECF No. 20 at 4–6.

At step five of the sequential evaluation process, the ALJ considers vocational factors such as age, education, and work experience in conjunction with the claimant's RFC to determine if the claimant can adjust to other work in the national economy. § 416.960(a)(4)(v). The ALJ may meet this burden through the testimony of a vocational expert, or the use of the Grids. *Moss v. Astrue,*

No. 2:11-CV-44, 2012 WL 1435665, at *8 (N.D. W. Va. Apr. 25, 2012).  As explained by the

Supreme Court, the Grid Rules:

> relieve the Secretary of the need to rely on vocational experts by establishing
> through rulemaking the types and numbers of jobs that exist in the national
> economy. They consist of a matrix of the four factors identified by Congress –
> physical ability, age, education, and work experience – and set forth rules that
> identify whether jobs requiring specific combinations of these factors exist in
> significant numbers in the national economy. Where a claimant's qualifications
> correspond to the job requirements identified by a rule, the guidelines direct a
> conclusion as to whether work exists that the claimant could perform. If such work
> exists, the claimant is not considered disabled.

*Heckler v. Campbell*, 461 U.S. 458, 461–62 (1983).

Relevant here, Grid Rule 202.09 directs a finding of disabled when an individual who is

closely approaching advanced age, can perform light work, is illiterate or unable to communicate

in English, and has unskilled work experience or no previous work experience.  20 C.F.R. Part 404

Subpart P, Appendix 2, § 202.09.   "Rule 202.09 only applies to claimants who are illiterate[]" and

when there is substantial evidence that a plaintiff is not illiterate that rule does not apply.  *Bash v.

Comm'r of Soc. Sec.*, No. 2:18-cv-552, 2020 WL 10502589, at *5 (M.D. Fla. Mar. 13, 2020).

However, Grid Rule 202.10 directs a finding of not disabled when that same individual—one

closely approaching advanced age who can perform light work—has a limited or marginal

education (i.e., not illiterate).  20 C.F.R. Part 404, Subpart P, Appendix 2 § 202.10.

In considering a claimant's education to determine where the claimant's education level

falls pursuant to the Grid Rules, the ALJ evaluates the claimant's "formal schooling or other

training which contributes to [a claimant's] ability to meet vocational requirements," and includes

consideration of whether the claimant is illiterate. § 416.964(a), (b)(1).  The ALJ determines what

education level the claimant has achieved from the following categories: (1) illiteracy; (2) marginal

education; (3) limited education; and (4) high school education. § 416.964(b).

Under the regulations, the education levels are defined as follows:

(1) Illiteracy. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

(2) Marginal education. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

(3) Limited education. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

(4) High school education and above. High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that someone with these educational abilities can do semi-skilled through skilled work.

§ 416.964(b)(1)–(4).

The regulations further recognize that "grade level . . . completed in school may not represent your actual educational abilities" and other evidence may show your actual abilities are higher or lower. *Id.* For example, one court held that although the plaintiff had only a fourth-grade education, the ALJ did not err by categorizing a Plaintiff's education as "limited" as opposed to "marginal" because that finding was supported by the facts that: he was in charge of a kitchen at two different restaurants; he was responsible for supervising other employees including hiring and firing of employees; he owned a restaurant; and had the ability to pay his bills. *Jimenez v. Berryhill*, No. 16-cv-3972, 2018 WL 4054876, at *4–6 (E.D.N.Y. Aug. 24, 2018). Thus, a plaintiff's education level is not solely determinative in deciding whether the plaintiff is illiterate or not illiterate, and ALJs should weigh all the evidence in the record when considering illiteracy.

Generally, "the standard of literacy is low and 'the question is only whether the plaintiff is so deficient in his ability to read and write that he cannot obtain even an unskilled job.'" *Jimenez*, No. 16-cv-3972, 2018 WL 4054876, at \*4 (citing *Gross v. McMahon*, 473 F. Supp. 2d 384, 389 (W.D.N.Y. 2007) (citation omitted). In the face of conflicting evidence regarding illiteracy, courts will not disturb an ALJ's decision so long as the ALJ provides "a thorough discussion of why he found Plaintiff had a limited education and was not illiterate." *Chesney v. Berryhill*, No. 1:18-66-BHH-SVH, 2019 WL 1064034, at \*20–21 (D.S.C. Jan. 16, 2019) ("it is not the role of this court to reweigh the evidence."). In *Chesney*, the ALJ supported his finding that Plaintiff was not illiterate by referring to the plaintiff's testimony that he could read and write a little, his completion of the eighth grade, the plaintiff's previous job which required reading stock numbers, and the plaintiff's ability to drive. *Chesney*, No. 1:18-66, 2019 WL 1064034, at \*20–21. *See also Caudill v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 510, 516 (6th Cir. 2011) (finding substantial evidence supported an ALJ's decision to find a plaintiff not illiterate where the plaintiff had a second-grade reading level and was diagnosed with a developmental reading disorder, but was able to read and write a grocery list, successfully worked for many years, attended school into the twelfth grade, and had at least a fair ability to understand, retain, and follow instructions). Accordingly, courts will decline to disturb an ALJ's determination regarding literacy so long as the ALJ gives "gave specific reasons for [the] determination" and "ma[kes] a thorough evaluation of the evidence." *Boyce v. Chater*, 114 F.3d 1175, \*1 (4th Cir. 1997) (per curiam).

Here, at step five, the ALJ determined that Plaintiff has a limited education. R. at 25. The ALJ found "[t]here is some indication in the record that the claimant is illiterate." R. at 26. For example, the ALJ noted that Plaintiff's function report, which was written by his wife, states Plaintiff cannot read, evidence indicates Plaintiff was enrolled in special education classes, and

Plaintiff required verbal instructions for his medications.  R. at 26 (citing R. at 270–81, 451–66, 469–641).  The ALJ also highlighted Plaintiff's testimony that he cannot read, he does not have a driver's license, and did not need to read or write in his past employment.  R. at 26 (citing R. at 36–65).  On the other hand, the ALJ also considered evidence in the record that Plaintiff is not illiterate.  R. at 26.  The ALJ found Plaintiff completed ninth grade and he did not require special accommodations for his intelligence testing based on an inability to read or write.  R. at 26 (citing R. at 812–22, 36–65).  The ALJ ultimately found that based on this evidence, Plaintiff is not illiterate, but included a limitation that Plaintiff "cannot perform work requiring an ability to write reports or read written instructions" in Plaintiff's RFC.

In this case, the ALJ thoroughly discussed Plaintiff's claim of illiteracy by recognizing and considering evidence regarding Plaintiff's literacy, and that determination is supported by substantial evidence.  R. at 26.  Like in *Chesney*, the ALJ "provided a thorough discussion" regarding why Plaintiff was not illiterate by referencing Plaintiff's education, and past work experience.  R. at 26.  The ALJ discussed the evidence suggesting the Plaintiff was illiterate in addition to the evidence that Plaintiff was literate, and concluded that Plaintiff was not illiterate. The ALJ provided "specific reasons" for the literacy determination, and the Court cannot disturb the ALJ's determination.  *Boyce*, 114 F.3d 1175.  Finally, the ALJ also accounted for Plaintiff's limitations with literacy by including a limitation in Plaintiff's RFC that he cannot perform work requiring an ability to write reports or read written instructions.  R. at 22, 26.  Accordingly, the ALJ thoroughly and sufficiently discussed Plaintiff's claim of illiteracy.

Moreover, other evidence in the record supports the ALJ's conclusion.  Like the plaintiff in *Jimenez*, Plaintiff here had supervisor type responsibilities in his previous job at Golden Corral because he helped open the restaurant, and has the ability to pay his bills on his own.  R. at 46, 69,

77 (noting Plaintiff can go out alone, shop in stores, and handle money), 81–82, 92, 100. Additionally, in his Disability Report, Plaintiff checked boxes confirming he can speak and understand English, he can read and understand English, and he can write more than his name in English. R. at 257.

Plaintiff argues that the ALJ did not sufficiently consider Plaintiff's claim of illiteracy because the Social Security Administration's POMS dictates a finding that Plaintiff is illiterate. ECF No. 17 at 6–7. Specifically, Plaintiff points to language in POMS that states ALJs should not rely on test results alone to determine that a claimant is illiterate, and that if the claimant cannot read or write at the fourth-grade level or higher, the claimant must be found illiterate. *Id.*; POMS DI 25015.010(C)(1)(b). However, Plaintiff's arguments are not persuasive.

First, and foremost, POMS is a guideline for ALJs that "explains the meaning of Social Security Act terms as well as the meaning intended by terms appearing within the regulations." *Davis v. Sec'y of Health & Human Servs.*, 867 F.2d 336, 340 (6th Cir. 1989) (internal citations omitted); SSR 13-2p, 2013 WL 621536, at *15 (Feb. 20, 2013) ("We require adjudicators at all levels of administrative review to follow agency policy . . . and other instructions, such as the Program Operations Manual System (POMS) . . . ."); *see Teresa C. v. Saul*, No. 3:19cv462, 2020 WL 5228161, at *11 n.5 (E.D. Va. Aug. 17, 2020). However, while POMS may be persuasive, it "*does not* have the force and effect of law." *Davis*, 867 F.2d at 340 (emphasis added). Second, as recommended by POMS, the ALJ did not rely on test results alone to conclude that Plaintiff is not illiterate. The ALJ did consider Plaintiff's testing with Dr. Jett—but not necessarily those testing results. R. at 26. Rather, the ALJ noted that Plaintiff did not indicate that he required special accommodations due to the inability to read or write. R. at 26. Moreover, the ALJ also explained that Plaintiff completed a ninth-grade education. R. at 26. Third, contrary to Plaintiff's assertion,

neither the Commissioner's regulations nor POMS mandate that if a claimant cannot read or write at a fourth-grade level or higher then the claimant must be illiterate. *See* ECF No. 17 at 7. Rather, the regulations specifically recognize that "grade level . . . completed in school may not represent your actual educational abilities" and other evidence may show your actual abilities are higher or lower. § 416.964(b). POMS states that "if the evidence in the case shows that the claimant cannot read or write a simple message . . . despite having completed at least 4th grade, find the claimant illiterate." POMS DI 25015.010(C)(1)(b). The ALJ did not find that Plaintiff was unable to read or write a simple message, and therefore there was no obligation under POMS to find Plaintiff illiterate.

In sum, substantial evidence supports the ALJ's conclusion because of these aforementioned findings. The ALJ made credibility determinations about the evidence regarding Plaintiff's literacy and a sufficient explanation supported by the record as to why she found Plaintiff not illiterate. *See Schoofield v. Barnhart*, 220 F. Supp. 2d 512, 515 (D. Md. 2002) ("[I]f the ALJ has done his or her job correctly and supported the decision reached with substantial evidence, [courts] cannot overturn the decision, even if [they] would have reached a contrary result on the same evidence."). Since the ALJ's decision finding Plaintiff not illiterate is supported by more than a "mere scintilla of evidence," the Court will not disturb that decision.

**B. Even if the ALJ Erred by Failing to Identify Plaintiff's Diabetic Feet and Foot Disorders as Medically Determinable Iimpairments, and the ALJ Adequately Considered Plaintiff's Diabetic Feet in Her Decision.**

Plaintiff's second challenge to the ALJ's decision is that the ALJ failed to consider his diabetic feet and foot disorders as medically determinable impairments. ECF No. 17 at 9–15. Plaintiff argues there is "a substantial amount of highly relevant medical evidence" regarding his diabetic feet and foot disorders and if the ALJ had considered them properly, then Plaintiff's RFC

would have been classified as sedentary, rather than light.  ECF No. 17 at 9.  Plaintiff argues if the ALJ had considered his feet and foot disorders MDIs then he would be disabled regardless of the illiteracy issue.  ECF No. 17 at 9.  Specifically, Plaintiff argues "[t]his is about the ALJ not considering the well-documented presence of [his] diabetic feet and foot disorders as MDIs in the first place."  ECF No. 17 at 10.  Plaintiff also argues "the potential impact from his diabetic feet and foot disorders were never considered in the formulation of the RFC" and his feet and foot disorders "may impact his ability to stand and walk."  ECF No. 17 at 11; 14.

In response, the Commissioner argues the ALJ's consideration of Plaintiff's impairments is supported by substantial evidence.  ECF No. 19 at 14–18.  The Commissioner argues although the ALJ did not list Plaintiff's diabetic feet and foot disorders as a severe impairment, the ALJ still properly followed the sequential evaluation process.  ECF No. 19 at 15.  Specifically, the Commissioner argues the ALJ found Plaintiff's diabetes mellitus to be a severe impairment, the ALJ considered all of Plaintiff's symptoms in formulating Plaintiff's RFC, and the ALJ expressly considered Plaintiff's diabetic feet and foot disorder in her analysis.  ECF No. 19 at 16.  For example, the ALJ included Plaintiff's testimony from the ALJ hearing regarding his feet pain and his feet examinations.  ECF No. 19 at 16–17.  The Commissioner also argues the ALJ found medical opinions about Plaintiff's foot and feet disorders unpersuasive because they were "not supported by their own notes as their notes did not establish such limitations in standing and walking."  ECF No. 19 at 17–18.  Therefore, the Commissioner argues even if the ALJ made an error at step two by not classifying Plaintiff's diabetic feet and foot disorders as a severe impairment, the ALJ's analysis throughout the rest of the sequential process makes that potential error irrelevant or harmless.  ECF No. 19 at 16.  In sum, the Commissioner argued "the ALJ did

not decline to consider Plaintiff's diabetic feet and foot disorders, but reasonably evaluated them in accordance with the evidence." ECF No. 19 at 18.

At step two of the sequential evaluation process, the ALJ must consider the "medical severity" of the claimant's "medically determinable impairments." § 416.920(a)(4)(iii). A medically determinable impairment "must be established by 'objective medical evidence from an acceptable source.'" § 416.921. Objective medical evidence means "laboratory finding" or "abnormalities that can be observed" apart from the claimants' statements. § 416.902(f) & (g). The ALJ does not use a claimant's "statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment." § 416.921. The ALJ must then determine whether the plaintiff has a physical or mental impairment and once it is established that the plaintiff has a medically determinable impairment, the ALJ determines whether the impairment is "severe." § 416.921. However, an ALJ must consider the impact of all of the claimant's medically determinable impairments, whether they are severe or not, in determining the claimant's RFC. § 416.945(a)(2).

If an ALJ does not address a medical condition or impairment at step two of the sequential analysis, but does address it later in the analysis, then courts generally find no error. Additionally, "district courts in [the Fourth Circuit] have adopted the view that an ALJ does not commit reversible error by omitting an impairment at step two, so long as the ALJ considers the impairment in subsequent steps." *Woodson v. Berryhill*, No. 17-347, 2018 WL 4659449, at *4 (E.D. Va. Aug. 7, 2018). Specifically, an ALJ's "spareness" in discussing steps two and three, but doing a substantive discussion at the RFC and "collapsing . . . the analysis . . . is not the preferred form of opinion writing for an ALJ because it makes review of his opinions more difficult, but it is not necessarily reversible error." *Jones v. Astrue*, No. 5:07-CV-452-FL, 2009 WL 455414, at *3 (E.D.

N.C. Feb. 23, 2009). For example, when an ALJ did not discuss a plaintiff's anemia at step two, but did address the anemia during the RFC analysis and "failed to find any limitation associated with the anemia[]" then the RFC analysis was sufficient. *Lipperman v. Colvin*, No. 12-2635, 2014 WL 819497, at \*12 (D.S.C. Feb. 28, 2014). Similarly, in *Woodson*, the ALJ did not discuss cervical spinal stenosis, cervical myelomalcia, and cervical myelopathy at step two of the sequential analysis, "but gave appropriate consideration to those impairments later in the RFC assessment." *Woodson*, No. 17-347, 2018 WL 4659449, at \*5. Since the ALJ "sufficiently discussed [the plaintiff's] conditions throughout his decision" the ALJ did not commit reversible error by not noting cervical spine impairments at step two of the sequential analysis. *Id.*

In this case, at step two, the ALJ identified diabetes mellitus as one of Plaintiff's severe medically determinable impairments, but did not specifically identify Plaintiff's diabetic feet and foot disorders as medically determinable impairments. R. at 19. However, throughout the RFC analysis, the ALJ referenced and considered Plaintiff's diabetic feet and foot disorders. R. at 22–24.

Specifically, the ALJ noted Plaintiff's testimony that he is unable to work partly due to foot pain, and that he cannot stand for very long due to foot pain. R. at 22. The ALJ further discussed Plaintiff's diabetes, and noted that Plaintiff's "diabetes is generally [] well-controlled, but examinations of the claimant's feet reveal some abnormalities in the skin and nails." R. at 23 (citing R. at 658–60, 823–31, 841–52, 869–72). The ALJ found that despite Plaintiff's foot pain, he was able to take out the garbage, do dishes, and use public transportation. R. at 22–23. The ALJ further noted that despite his diabetic condition, Plaintiff walks with a normal gait. R. at 23.

Thus, contrary to Plaintiff's assertion that the ALJ did not consider Plaintiff's diabetic foot condition at all, the ALJ specifically cited to the records which Plaintiff identifies the ALJ should

have considered. The ALJ concluded that Plaintiff's diabetes contributes some to his RFC limitations, but that his foot condition is inconsistent with limitations in weight-bearing. R. at 23–24. Accordingly, even if the ALJ should have identified Plaintiff's diabetic feet and foot conditions as medically determinable impairments at step two, the ALJ adequately considered those impairments and their effect on Plaintiff's RFC in her RFC analysis, and the ALJ did not err on this ground.

## VI. RECOMMENDATION

Because substantial evidence supports the Commissioner's decision and the correct legal standard was applied, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 16, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 18, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the

above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for Plaintiff and the Commissioner.

Lawrence R. Leonard
United States Magistrate Judge

Newport News, Virginia
December 28, 2022